Granger, C. • J.
The statutes regulating pleadings, appeals and proceedings in error in force pending the action below were worded substantially, if-not precisely, as the Revised Statutes. Section 5059 authorized a defendant to file an answer asking affirmative relief, to be styled “ a cross-petition.” The only provision for a summons upon a cross-petition is in section 5074. Its object is to bring in as a defendant a person not at the time a party to the original action. Moreover, section 5097, fixing rule days for pleadings, directs that an answer to a petition shall be filed on or before the third Saturday “after the return day of the summons,” while the answer to a cross-petition shall be filed on or before the third Saturday “ after the cross-petition is filed.” These sections imply that no summons is to go out upon a cross-petition except to bring some one into court who is not already there. To summon those already in court would add materially to the cost of litigation without reason. The cross-petition can ask relief only “touching the matters in question in the petition.” The same section (5071)' that tells what a defendant may set forth in his answer includes the matter of a cross-petition. Every other defendant is warned to examine the court files, after the rule day for answer, for cross-petitions against himself, as fully as is the plaintiff in the action. We find no statutory provision for cross-petitions in error. In practice they have been sanctioned, and we think that the same rule ought to apply to them as to cross-petitions in the common pleas. No summons for, or waiver by, William A. Elliott in the cross-petitions was necessary or proper. He was already in court.
A like principle applies to the revivor. Its object was to bring the administrator and the heirs into court in the place *486 of the decedent. Upon Brown’s application they were duly brought here, and they are here for the whole case.
A more difficult and- perplexing question is presented by Elliott’s motion to dismiss the appeal. Case No. 11190 was first brought, and Kuhn and Elliott might well have been made defendants therein to cross-petitions by Brown and the Bank. Kuhn might clearly have been made a defendant to the petition; and Elliott also, because of Sohngen’s claim that he was bound to relieve the land by paying the Kuhn debt. If they had been so made defendants, Kuhn could not have asked a personal judgment against Elliott, because in his answer he could only “ ask relief touching the matters set up in the petition.” From any decree rendered in that action either party could appeal. In it the land had been sold and. its proceeds were in court for distribution. “The consolidation was made in .order to determine who was entitled to that fund.” So says the argument for Elliott’s administrator and heirs. The journal entry in the common pleas .expressly states that the issues were submitted to it “for-finding and decree as to the right of the respective parties in said fund, and for an order and decree of distribution thereof.” It is a fair presumption that the case resulting from a consolidation made for the purpose of settling rights in a fund and determining its distribution, was the case in which the fund was created and held. We know of no law recognizing a case in which the assignees of Sohngen and Kuhn could be joined as plaintiffs under the state of facts shown by this record. The “ consolidated case ” was either two cases tried together at the same time, upon the same evidence, for the convenience of parties, or it should be treated as one case conforming to statutory requirements regulating a civil action. -The parties have treated it as one case, and in order to do justice and equity this court ought to acquiesce in their action. But the law does not allow two petitions by different plaintiffs in the same action. It does' not permit a petition containing different causes of action in one of which one set of plaintiffs are alone interested, and a second in *487 which another set of plaintiffs are alone interested. After the consolidation one of the petitions necessarily ceased to be a petition and became an answer and cross-petition. Considering the object of the consolidation the petition that produced the fund, following the rule of the “ survival of the fittest,” became the petition .in the consolidated case.
We think'therefore that the “ consolidation ” should be considered as substantially effecting the appearance of Kuhn and Elliott as defendants in No. 11190. As a result, Kuhn could not assert in the consolidated case any claim to a personal judgment against Elliott. The agreed purpose of the consolidation and the terms of section 5071, Rev. Stat., unite in prohibiting such a claim by him. We do not overlook the fact that the “ consolidation ” was “ by agreement of parties.” But we think that no such agreement should be permitted to make a legal monstrosity, such as a double-•headed civil action. They must be presumed to intend the creation of a civil action of the statutory form and with the statutory pleadings; an action with but one petition. From the nature of the question to be determined in the consolidated case, the petition of Sohngen’s assignees in No. 11190 became the petition in the consolidation. We treat their cross-petition in No. 11483 as an amendment thereto, and regard Kuhn’s petition as a cross-petition in the new case. If we are right in thus treating the case it was appealable as against William A. Elliott. The doctrine of Dodsworth v. Hoppel, 33 Ohio St., 16, supports this position.
This brings us to the merits. We think the evidence clearly proved that as between William A. Elliott and Sohngen, Elliott was liable for the entire judgment against George Elliott and his bondsmen. William and George testified that Sohngen was liable for half of it, and that at the time of the sale of the 130 acres the whole matter was settled by Sohngen’s agreement to pay $2,850 to the man in Cincinnati. Sohngen testified that under the original agreement William Elliott was to pay all of George’s debt. Sohngen’s clerk corroborated this. Ordinarily a reviewing court will not disturb the finding of the trial *488 court upon conflicting testimony. But this record presents an array of undisputed facts which, we think, are so plainly inconsistent with the claim of the Messrs. Elliott,' that the finding ought to have been in favor of Sohngen.
In 1871, William operated the distillery at a loss to himself and paid §3,000 on the debt. While doing this he not only did not call on Sohngen for help, but he also paid him in full for all the malt furnished by him. In May, 1872, although William had then paid §3,000 of the debt, and Sohngen nothing, William with his wife, mortgaged to Sohngen 450 acres of land, and gave him his negotiable notes to the amount of §12,000, running for two, three and four years. He knew that these notes and that mortgage were pledged by Sohngen in order to obtain the §9,605.49 which was paid upon the judgment. In his sworn account (filed in June, 1876,) as assignee of George, William credited himself with having paid the whole of this §9,605.49, as well as the §3,000, and -drew the dividend belonging thereto as on valid claims against George’s estate. It is urged that this account was prepared by his counsel, and that William ignorantly verified it. It seems to us unlikely that William would forget within four years after the §9,605 was paid, the source from which it came, and we must treat his affidavit to that account as weighing against him upon the point in question. But we will not dwell on this, because more convincing evidence is in the record.
On April 12th, 1873,' when William Elliott knew that his mortgage and notes were held by a “ man in Cincinnati ”— for value and before maturity — he agreed to convey the 130 acres to Sohngen. He took from Sohngen an agreement to pay, as part of the purchase money, “to interest on §10,000, mortgage held by man in Cincinnati, §850,” and “amount cash to William A. Elliott to pay on principal of §10,000 mortgage held by man in Cincinnati, §2,000.” The Elliotts claim that this §2,850 represented ali of William’s half of the debt that was then unpaid. If that were so, the best and shortest phrase would have been to follow the enumeration of the other items composing the §14,000 of purchase *489 money by the words “ and pajr in full the mortgage held by the Cincinnati man.” If William was to have nothing more to do with that debt, what mattered it to him that the $850 was to be paid on the interest and the $2,000 on the principal ? William’s counsel was at hand and the memorandum resulted from his prudent suggestion to put in writing what they had agreed should be done. One week later William and his wife conveyed the 180 acres to Sohngen. He not only did not take from Sohngen a mortgage to secure compliance by Sohngen with the alleged agreement to pay the Cincinnati man in full, but he covenanted that the 130 acres was then free from all incumbrance and that he would warrant Sohngen and his heirs and assigns against all lawful claims upon said land. William then knew that the mortgage and his notes were a valid and lawful- incumbrance on that land in favor of “the Cincinnati man.” His lawyer had cautioned him to put the agreement in writing. Instead of calling upon Sohngen to agree by some writing to keep him and the 320 acres harmless from the mortgage, he covenanted expressly that he (Elliott) would warrant Sohngen and any owner of the 130 acres under him against that mortgage. His notes matured in 1874, 1875 and 1876, yet the evidence does not show that he made inquiry after them, or sought in any manner to get control of them until after Kuhn sued on them. '
On June 11-14, 1876, the last of his three notes became due, and on June 30th, 1876, he verified his account as assignee, claiming that all of the $9,605.49, raised by the pledge of his mortgage and notes, was his money; that he had paid it on the judgment. For six years William acted as if the whole debt was his own; as if he had no right to call on Sohngen to pay it. On the other side — Sohngen’s conduct was not inconsistent with his claim. As between him and the United States he was liable for the whole judgment. It was for his interest to aid as he did in raising the money. William’s mortgage made him absolutely secure. So long as that existed as a valid lien, Sohngen’s estate was sure of reimbursement for any payment made by him to *490 Kuhn. So far as he paid anythipg to Kuhn, he was paying it upon his own notes. To refuse to meet, or renew them, would affect his credit. Up to Sohngen’s failure William had so dealt with him, that he might well be willing to delay such steps as would produce a foreclosure upon William’s land. A refusal to renew his notes to Kuhn would have forced a foreclosure. William’s request to Sohngen to take other land in payment, made after the sale of the 130 acres, showed that he was not able to pay in money. William’s offer to pay in land, and Sohngen’s absolute security by means of the mortgage, would have rendered harsh any steps leading to foreclosure. Sohngen’s action was natural, and, as already said, not inconsistent with his claims. But if William’s claim was true his conduct was unaccountable. We have no hesitation therefore in holding that the finding of the district court upon this matter was unsupported by the evidence.
We also think that Kuhn did not take the Elliott notes after all of them were due. Kuhn first took the mortgage and notes May 7, 1875. At that time only one of Elliott’s notes was due. The subsequent transactions were merely renewals of the same debt. No additional loan was made by Kuhn. He gave up overdue notes and took new notes in place of them, receiving money to make good his interest or discount; but, all the while, he held Elliott’s mortgage and notes as collateral. Kuhn held, therefore, the first mortgage lien upon both tracts- of land for the true sum due to him from Sohngen after deducting the usury.
Even if Elliott’s claim that Sohngen should pay all of the Kuhn debt were true, we think that Brown and the bank were entitled to a decree requiring Kuhn to exhaust the 320-acre tract first. It is only when equities are equal that the elder prevails. When the holder of the elder equit}'- has so acted as to estop himself from asserting it against the holder of the younger equity, the latter must prevail. By his deed of April 19, 1873, Elliott said, in effect, to Brown: “You need not inquire back of this day; I vyarrant you that this land is now clear and free from *491 every valid incumbrance.” He then knew that a Cincinnati man held for value his mortgage securing notes not then due. By the express terms of his covenant Sohngen’s assigns had a right to rely on that covenant as a statement of fact, even if the claim that they could not recover against him on his covenant be valid. It is unnecessary in this case to decide whether a mortgagee, standing as Brown does, could recover on such a covenant. Reading it in the deed, Brown had a right to believe that the debt secured by the mortgage of April 19, 1873, was Elliott’s debt, and that Elliott’s 320 acres would be first applied to -pay itl No claim is made that Elliott acquired any equity after April 19, 1873. Every claim that belonged to him at the time of the trial below belonged to him when he delivered the deed to Sohngen. Even if the rule required Brown to inquire for equities of later growth, he had a right to rely upon the covenants in the deed of April 19, 1873, as an assurance that there then existed no right in Elliott to enforce, in any manner, an incumbrance upon the 130-aere tract. Having made that assurance part of the recorded title to the land, subsequent purchasers and mortgagees who parted with their money, believing it to be true, ought not to suffer loss at his instance because his deed did not state the truth.
It is claimed that such covenants do not prevent the enforcement of a vendor’s lien for the unpaid purchase-money. That is true. But in this case, as the record indicates, the entire $14,000 of purchase-money was paid.
It is urged that in 1875 Sohngen actually paid off the debt secured 'by the pledge of the mortgage when he settled with Clawson and transferred the pledge to Kuhn ; that as between Sohngen and Elliott the mortgage was then extinguished by satisfactioñ.
But Elliott had no part in that transaction. He must base his claim for any benefit from it upon rights that belonged to him (if ever) before he made the deed of April, 1873. According to the views hereinbefore expressed his covenants in that deed estop him as against Brown and *492 the Bank from asserting rights, then and theretofore belonging to him, in any way enforcing any then existing incumbrance on the ISO acres. If because of some new consideration moving from Elliott after April 19, 1873, Sohngen had extinguished the mortgage as between himself and Elliott, while leaving it in force in favor of Kuhn against both of them, a different question would be presented. No such considerations, however, will avail Windisch. Unless the debt to Kuhn is William’s debt, Windisch cannot ask the application of the 320 acres to pay Kuhn.
Mrs. Sohngen’s claim for dower remains for decision. We think it is so connected with the main controversy that the appeal brought it into the district court unaffected by the decree in the common pleas. If the final finding shall determine that the entire debt to Kuhn is' the debt of William Elliott’s estate, and the 320 acres shall suffice to pay it, Mrs. Sohngen will be entitled to the value of her inchoate dower in the proceeds of the 130 acres. If, however, any of the Kuhn debt was in fact Sohngen’s debt, the sum of the money required to pay Sohngen’s part of that debt must be deducted from.the proceeds of the 130 acres in determining the extent of her dower claim, notwithstanding the fact that the equity of Brown and the Bank may throw Kuhn wholly upon the 320-acre tract. So far as any of the Kuhn mortgage was Sohngen’s debt, Elliott’s estate has a right to have 'any of the proceeds of the 130 acres unconsumed by Brown and the Bank applied upon the Kuhn mortgage. In so far as Brown and the Bank (in such case) consume those proceeds, they take money that would have gone to Kuhn were he not controlled by their equity. As to it they would stand in his shoes so far as the dowress is concerned, and therefore she could not take from them.
Judgment of the district court reversed and the cause remanded.